# CV 16      1032

WEXLER, J.

TOMLINSON, M.J.



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

2016 MAR -2  AH 8: 49

-------------------------------------------------------------X

UNITED STATES OF AMERICA and THE STATE
OF NEW YORK *ex rel.* BETH LILLA
AND LINDA SCARLATO,

Plaintiffs/Relators,

-against-

16 CIV.

*QUI TAM* COMPLAINT
AND JURY DEMAND

(Filed *In Camera*
And Under Seal*)*

ADULTS & CHILDREN WITH LEARNING AND
DEVELOPMENTAL DISABILITIES, INC.

Defendant.

-------------------------------------------------------------X

Relators Beth Lilla ("Relator Lilla" or "Ms. Lilla") and Linda Scarlato ("Relator Scarlato" or "Ms. Scarlato") hereby allege as follows:

## PRELIMINARY STATEMENT

1.     This is a civil action brought by Beth Lilla and Linda Scarlato as co-relators on behalf of themselves and on behalf of the United States of America and the State of New York against Adult & Children With Learning and Developmental Disabilities, Inc. ("ACLD") under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729 et. seq. ("FCA") and the New York State False Claims Act, N.Y. State Finance Law § 190 ("NYSFCA").

2.     From at least 2008 through at least November of 2015, ACLD enriched itself by engaging in a persistent fraudulent and illegal billing practice which benefitted the organization at the expense of the taxpayer funded federal Medicare and state Medicaid programs. Astonishingly, ACLD was on notice of their fraudulent billing since *at least* 2008 and, since

1

then, has made a conscious effort to avoid reimbursing the federal government for its overpayments—even refusing to fund an internal audit to merely determine the extent of the fraud once Ms. Lilla and Ms. Scarlato blew the whistle.

3.      As explained in greater detail below, ACLD violated the FCA and the NYSFCA when it billed services performed by non-physicians at the physician's rate by fraudulently characterizing the non-physicians' services as "incident-to" the physicians' care.  They did this by creating billing templates in their medical billing computer systems that automatically billed service performed by non-physicians at the rate of physicians without any regard for the physician's actual involvement in the patient's care.   In other words, they illegally and fraudulently up-charged the United States and New York State Governments, and did so as a matter of policy for at least seven years.[1]

4.      Additionally, ACLD falsely certified its Medicare and Medicaid reimbursement forms to the government when it provided outpatient speech-language pathology and physical therapy services to its patients without any active and current treatment plans, as required for reimbursement under 42 C.F.R. §§ 424.24(b) and (c).   ACLD knowingly certified these reimbursement requests when the required treatment plans remained unsigned, out of date, or never even existed at all.

## JURISDICTION AND VENUE

5.      Relators invoke this Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331.  Relators also bring this claim under 31 U.SC. § 3729.  The Court has supplemental

---

[1] Moreover, ACLD was aware of this fraud as early as 2008 and engaged in wrongful retention of these illegally acquired payments from the government in violation of 31 U.S.C. § 3729(a)(1)(G).

jurisdiction over Relators' state law claims pursuant to 28 U.S.C. § 1367 and 31 U.SC. § 3732(b).

6.      Venue is proper in the Eastern District of New York, pursuant to 28 U.S.C. § 3732(a), because the Defendant is located in this district and all the acts complained of occurred within this district.

## PARTIES

7.      Beth Lilla resides in Westbury, Long Island.  She is the mother of six children. She currently works as a practice manager for a medical group in Garden City, Long Island.

8.      Ms. Lilla has over 15 years of experience as an administrator in medical offices. Prior to joining ACLD in 2009, she worked for three separate medical offices where she became familiar with medical billing and general medical office administration.

9.      The last position Ms. Lilla held at ACLD was as Health Services Accounts Receivables Supervisor, where she worked exclusively on finance and billing, and reported directly to ACLD's Controller, Sandi Gutmanstein.  She held that position from March 2014 until she left ACLD in July 2015.  Prior to holding that position, she was the Health Services Coordinator Practice Manager ("Practice Manager") for the clinic where she was responsible for doctor credentialing and patient and clinician scheduling, among other duties.

10.     Ms. Lilla is an "original source" of the information giving rise to the herein cause of action pursuant to 31 U.S.C. § 3730(e)(4)(A).

11.     Linda Scarlato resides in Amity Harbor, Long Island and lives with her disabled 34 year-old son.  Since she was terminated by ACLD on November 20, 2015, she has worked part-time and is looking for full-time employment.  Since December 16, 2015 she has worked

five hours per week as a corporate compliance officer for a healthcare organization on Long Island.

12.     Ms. Scarlato has been working in the healthcare industry since 1972. She has a bachelor's degree in health administration and is a registered nurse. She is also a registered health information technician through the American Health Information Management Association.

13.     She joined ACLD in 2006 as a senior compliance analyst, a position she held until she was terminated on November 20, 2015. For the bulk of her time at ACLD, she was responsible for conducting internal audits of ACLD's patient medical and billing records to make sure services were billed appropriately. She was responsible for determining whether "coding" was correct based on the services provided, whether the patients were properly referred for non-physician services, and whether treatment plans were updated and in place for those patients that required them under the Medicare rules, among other duties. Starting in 2015, she spent the majority of her time on the added responsibility of investigating abuse complaints from patients and staff.

14.     Ms. Scarlato is also an "original source" of the information giving rise to the herein cause of action pursuant to 31 U.S.C. § 3730(e)(4)(A).

15.     The parties with the largest interest in this *qui tam* action are the United States of America, through the United States Department of Health and Human Services ("HHS") and the State of New York, through its Department of Health ("DOH").

16.     HHS is located at 200 Independence Avenue, SW, in Washington, DC 20201.

17.     DOH is charged with administering the New York Medicaid Program, which it does through its Office of Health Insurance Programs, located at Corning Tower, Empire State Plaza Albany, NY 12237.

18.     Defendant ACLD is a not-for-profit that provides a range of services, including health services, to people with developmental disabilities.

19.     In 2014, ACLD had over 1300 employees and total assets in excess of 65 million dollars.

20.     ALCD received over 45 million dollars in revenue from government medical reimbursements in 2014.

21.     ACLD's primary location is at 807 South Oyster Bay Road in Bethpage, NY 11714. It also has offices in other locations throughout Long Island. ACLD receives funding from the New York State Office For Persons With Developmental Disabilities (OPWDD) as well as federal funding through Medicare and Medicaid. ACLD's Health Services includes a clinic which bills for itself, with revenue going to ACLD. All of the Clinic's revenues are billed through its NPI and tax identification number.

22.     While the Clinic has doctors on staff, it contracts with various outside vendors to provide other health-related services such as Speech Language Pathology, Physical Therapy and some Occupational Therapy. It also employs a number of social workers and nurse practitioners. Finally, many of ACLD's patients are referred by social services and nearly all of the patients are Medicare and/or Medicaid recipients.

## FACTUAL ALLEGATIONS

### MEDICARE AND MEDICAID BILLING REGULATIONS

23.     Medicare, established by Title XVIII of the Social Security Act, is a federally-funded health insurance program primarily benefitting the elderly and disabled.  Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of physician services, diagnostic tests, and other medical services not involving inpatient and nursing home care.  Medicare reimbursements are paid from the federal Supplementary Medical Insurance Trust Fund.

24.     Medicaid, enacted in 1965 under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq., is a medical assistance program for the needy that is financed by joint federal and state funding and is administered by the states according to federal regulations, oversight, and enforcement.

25.     To obtain Medicaid funding, a state must have a plan for medical assistance. 42 U.S.C. § 1396. The plan must contain procedures relating to payment for services sufficient "to assure that payments are consistent with quality of care." 42 U.S.C. § 1396a(a)(30)(A).

26.     Each state participating in the Medicaid program must have a fraud detection program, and the state plan must provide for exclusion of persons who have committed fraud or abuse. "Abuse means provider practices that are inconsistent with sound … medical practices, and result in an unnecessary cost to the Medicaid program, or in reimbursement for services … that fail to meet professionally recognized standards for health care." 42 C.F.R. § 455.2 (emphasis in original).

27.     Medicaid regulations also provide that the plan require that each service eligible for reimbursement "be sufficient in amount, duration, and scope to reasonably achieve its purpose." 42 C.F.R. § 440.230(b).

### a. Medicare "Incident to" Billing

28.     "Incident to" billing allows a healthcare provider to bill a non-physician practitioner at the reimbursement rate of a physician, even though the non-physician practitioner has performed the work.  Reimbursement is 100 percent of the physician's Medicare fee schedule, which is always a higher reimbursement than the provider would receive under the non-physician practitioner's Medicare fee schedule.

29.     C.F.R. § 410.26 sets forth basic conditions for Medicare and Medicaid reimbursement for medical services incident to a physician's professional services. Section 410.26(b)(2) states that "services and supplies must be an integral, though incidental, part of the services of a physician (or other practitioner) in the course of diagnosis or treatment of an injury or illness." The Government's Center for Medicare and Medicaid Service's Medicare Benefit Policy Manual states, in pertinent part, that incident to billing for physical therapy, occupational therapy and speech-language pathology services "must relate directly to the physician/NPP service to which it was incident." Medicare Benefit Policy Manual, Section 230.6, "Therapy Services Furnished Under Arrangements With Providers and Clinics."[2]

30.     Additionally, C.F.R. § 410.26(b)(5) states that in order to be reimbursed, "services and supplies must be furnished under the **direct supervision** of the physician" (emphasis added).  C.F.R. § 410.26(a)(2), with reference to § 410.32(b)(3)(ii), defines "direct supervision" as follows: "Direct supervision in the office setting means the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." C.F.R. § 410.32(b)(3)(ii).

---

[2] https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c15.pdf

31.     Pursuant to 42 C.F.R. § 410.26(c)(2), special rules exist for incident to billing as it pertains to physical therapy ("PT"), occupational therapy ("OT") and speech-language pathology ("SLP") services. These rules are contained in 42 C.F.R § 410.59 (for OT), 42 C.F.R § 410.60 (for PT) and 42 C.F.R § 410.62 (for SLP). Section (a)(3)(iii) of each of these regulations states that the service may be furnished "[i]ncident to the service of, a physician, physician assistant, clinical nurse specialist, or nurse practitioner when those professionals may perform" PT, OT, or SLP services under state law.[3]

**b) Treatment Plan Requirement**

32.     Additionally, in order to receive Medicare reimbursement for PT or SLP services, they must be "furnished under a written plan of treatment that meets the requirements of § 410.61." 42 C.F.R §§ 410.59(a)(2), 410.60(a)(2), 410.62(a)(2).

33.     The treatment plan must certify that "[t]he individual needs, or needed, physical therapy or speech pathology services." 42 C.F.R § 424.24(c)(1).

34.     42 C.F.R § 410.61(c) requires a plan of treatment ("treatment plan") that prescribes the "type, amount, frequency, and duration of" PT, OT or SLP. The plan must be approved (a process called "recertification") every 90 days. 42 C.F.R § 424.24(c)(4). Every certification and recertification of a treatment plan requires the signature of the medical professional who created and certified the plan. 42 C.F.R § 424.24(c)(3) and (4)(iii).

35.     The creation and proper certification of a treatment plan is not an insignificant ministerial duty imposed on healthcare providers by the government. It is a prerequisite to payment. As 42 C.F.R § 424.24(b) states, "Medicare Part B *pays* for medical and other health

---

[3] 42 C.F.R § 410.60 (for PT) and 42 C.F.R § 410.62 (for SLP) use the language "under state law," while the regulation for OT, 42 C.F.R § 410.59, uses the slightly different phrase "within the scope of state law."

services furnished by providers…only if a physician certifies the content specified in paragraph (c)(1), (c)(4) or (e)(1)[4] of this section, as appropriate" (emphasis added).

- C.F.R § 424.24(c)(1) requires that the content of the certification must state that "(i) The individual needs, or needed, physical therapy or speech pathology services, (ii) The services were furnished while the individual was under the care of a physician, nurse practitioner, clinical nurse specialist, or physician assistant, (iii) The services were furnished under a plan of treatment that meets the requirements of § 410.61 of this chapter."  C.F.R § 424.24(c)(1).

- C.F.R § 424.24(c)(4) states the following requirements for recertification: "(i) Timing. Recertification is required at least every 90 days, (ii) Content. When it is recertified, the plan or other documentation in the patient's record must indicate the continuing need for physical therapy, occupational therapy or speech-language pathology services, (iii) Signature. The physician, nurse practitioner, clinical nurse specialist, or physician assistant who reviews the plan must recertify the plan by signing the medical record." C.F.R § 424.24(c)(4).

36.    In order to obtain a reimbursement from the government through Medicare or Medicaid, the healthcare provider must submit a properly certified CMS-1500 form.

37.    The back of the form contains a section entitled "SIGNATURE OF PHYSICIAN OR SUPPLIER."

38.    Below that heading, the form states: "In submitting this claim for payment from federal funds, I certify that:…"4)  this claim, whether submitted by me or on my behalf by the designated billing company, complies with all applicable Medicare and/or Medicaid laws,

---

[4] This provision does not apply in the instant matter.

regulations, and/or program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law..."

39.    Therefore, the act of submitting a claim for SLP or PT services without the required treatment plan constitutes a false certification.

**c) Summary of Allegations**

40.    To summarize, in order for a PT, OT or SLP service to be properly billed under the incident-to guidelines, the following requirements must be met:

a. The services must be performed under the "direct supervision" of the physician, meaning the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure (see C.F.R. §§§ 410.26(a)(2), 410.26(b)(5), 410.32(b)(3)(ii));

b. The supervising physician must be independently qualified under state law to provide the performed services (see C.F.R. §§§ 410.59, 410.60, 410.62);

c. The services billed incident to must relate directly to the course of treatment to which it was incident (C.F.R. § 410.26(b)(2));

d. The services must be furnished under a written plan of treatment (see C.F.R. § 410.61).

41.    As explained in greater detail below, Defendant knowingly and regularly violated Medicare's incident to guidelines by submitting bills for services performed by PTs and SLPs to physicians who were not physically present in the office, not involved in the course of treatment of these patients, not qualified under New York State law to provide the services, and without a legally valid written plan of treatment.

42.     Moreover, Defendant also engaged in fraudulent incident to billing with regard to nurse practitioner and social work services, which are not subject to the more stringent requirements as the above referenced services.

43.     Finally, Defendant failed to maintain and create treatment plans for SLP and PT patients as required for reimbursement under Medicare's own regulations.

## DEFENDANT'S MEDICARE AND MEDICAID BILLING FRAUD

44.     Nearly all of Defendant's patients receive some form of Medicare and/or Medicaid benefits.  Some patients exclusively receive Medicare and/or Medicaid, while other patients receive private health insurance with Medicare as the secondary payer (and Medicaid as the tertiary payer).

### a. Billing Process at ACLD During the Relevant Time Period

45.     When a patient would arrive at ACLD for an appointment with, for example, a speech-language pathologist ("SLP"), he would first check in at the reception desk.  The ACLD employee at the desk would then prepare the necessary documents to send to the speech language-pathologist, which would include a "superbill."

46.     A superbill is an itemized form used by ACLD (and other healthcare providers) that shows what services were rendered on a particular visit. A superbill is the main data source for creation of a healthcare claim, which will be submitted to payers like Medicare, Medicaid and private insurance companies for reimbursement.

47.     At the conclusion of the session, the SLP would write a "note" summarizing the patient's session, and the SLP would fill out a portion of the superbill—specifically, the diagnosis code and the Current Procedural Technology ("CPT") code.  A CPT code is a number

that corresponds to the service provided for the patient. For example, a frequent CPT code for an SLP is #92507, which covers individual services for treatment of speech, language, voice, communication, and/or auditory processing disorder.

48. At the end of the day, the SLP would typically put all the superbills together for the patients he saw and submit them to the secretary and/or receptionist.

49. The secretary would then give the superbills and notes to the Article 16 Treatment Coordinator, who would then give them to a physician (often Dr. Ronald Schenendorf for SLP services) to "countersign," meaning the physician has read and approved the note, and that the physician has determined that the SLP filled out the superbill accurately.

50. Then the superbill would be sent to the billing department and entered into a computerized billing program called "NextGen" (which has been used by ACLD since 2013), which would in turn generate a CMS-1500 bill to be electronically submitted to the government.

51. Form 1500 requires the submitting healthcare provider—in this case, ACLD—to disclose certain information in order to receive reimbursement from the government. This information includes: the date of service, the CPT code for the service, the rendering provider's national identification number ("National Provider Identifier" or "NPI") and provider's signature.

52. The back page of Form 1500 consists of a list of instructions, and states in pertinent part that a provider's signature certifies that "the information on this form is true, accurate and complete" and "the services on this form were medically necessary and **personally furnished by me** or **were furnished incident to my professional service by my employee under my direct supervision**, except as otherwise expressly permitted by Medicare or TRICARE..." (emphasis added). The back of the form also contains the incident to guidelines.

**b. Ms. Scarlato's Initial Discovery of the Fraud**

53.    In 2014, Ms. Scarlato conducted an audit of ACLD's SLP services.  To conduct the audit, Ms. Scarlato obtained a selection of bills generated after SLP services were performed at ACLD.  When she reviewed the "note" written by the SLP provider, she noticed that the note was also signed by Dr. Ronald Schenendorf, a psychiatrist who at the time was ACLD's Assistant Director of Mental Health Services.  She further noticed that the services were billed "incident to" his treatment of the patients.

54.    She immediately recognized a problem, because she knew Dr. Schenendorf, who was a psychiatrist, had no relationship with these patients that were receiving SLP services.

55.    Ms. Scarlato then went to speak to Dr. Schenendorf about the fraudulent billing.  Dr. Schenendorf told Ms. Scarlato that he knew this was improper, but that Mark Crean, who was Director of Health Services at ACLD from 2004 to October 2014 (and had worked at ACLD since 2006), and others told him he had to sign off on these notes even when he had no relationships with the patients.   He told her that they made him do this because the Clinic was having financial problems.  He told her he felt uncomfortable signing off on these notes.

56.    She advised Dr. Schenendorf to stop signing off on the notes where he had no relationship with the patient.

57.    Ms. Scarlato then reported the fraud to her supervisor and mentioned it in her audit report.

**c. Ms. Lilla's Initial Discovery of the Fraud**

58.    Beginning in March of 2014, Beth Lilla moved into a billing and finance position, where she became intimately familiar with ACLD's medical billing practices. By May of 2014, she was exclusively working on billing and finance issues.

59.     The billing computer program used by ACLD beginning in March of 2013 until she left ACLD in July 2015 was called "NextGen." Prior to that, ACLD used a program called "Medical Manager." NextGen allows users to easily program customizable billing templates based on the needs and billing practices of the health provider. Upon information and belief, Medical Manager had the same template mechanisms.

60.     In the spring of 2014, shortly after joining the billing and finance department, Ms. Lilla was assisting a colleague with data entry. When entering bills and observing how they were processed by NextGen, she noticed SLP services were being billed out under Dr. Schenendorf. The bills she first observed were not characterized as "incident to," but instead listed Dr. Schenendorf as the provider of the service.

61.     For Ms. Lilla, this raised a red flag. She knew based on her four years of experience as practice manager that Dr. Schenendorf did not, and could not, provide SLP services. Yet ACLD was fraudulently billing Medicare and Medicaid at his higher reimbursement rate than that of the speech language-pathologist who provided the health care service.

**d. Various Types of Fraudulent Billing Discovered by Co-Relators**

62.     After discovering a sampling of fraudulent billing, Ms. Lilla—on her own initiative—conducted an investigation to determine the extent of the fraud. Through reviewing bills within the NextGen system, logs of patient visits with physicians and other healthcare professionals, and based on her knowledge of the inner-workings of the office from her four years as practice manager, Ms. Lilla discovered widespread fraud with regard to ACLD's Medicare and Medicaid billing.

63.     While Practice Manager from 2010 to 2014 at ACLD, Ms. Lilla was told that ACLD did not do "incident to" billing. She was surprised in 2014 when she discovered widespread incident to billing practices. She was shocked when she realized the extent to which they were fraudulent.

64.     The fraudulent billing manifested itself in several different forms:

*(i) Fraudulent Incident To Billing: Physician Not Involved in Treatment of Patient*

65.     From at least 2008 until at least July of 2015, ACLD would regularly bill SLP and other services incident to a physician's services when that physician had no involvement in the patient's treatment.

66.     This was done through a template that was created in both Medical Manager and then in NextGen that automatically billed certain non-physician providers incident to the treatment of a physician, regardless of that physician's relationship (or lack thereof) with the patient.

67.     After Ms. Lilla alerted her superiors at ACLD to the fraud, a meeting was convened in September 2014 to discuss the issue of incident to billing. Ms. Lilla attended the meeting. Mark Crean explained that in 2006 or 2007, then-ACLD Executive Director Aaron Liebowitz and then-ACLD Assistant Executive Director Rick Wirth programmed Medical Manager to automatically bill certain non-physician providers incident to a physician's services.

68.     Mr. Crean further stated at the meeting that the plan was conceived to allow ACLD to bill Medicare and Medicaid for services provided by providers who were uncredentialed—in other words, providers who would have been otherwise unable to bill Medicare or Medicaid for their services. The plan was devised to use incident to billing to avoid the required credentialing.

69.     When ACLD switched from Medical Manager to NextGen in 2013, a team was assembled to program the new system.  Mark Crean and Sandi Gutmanstein similarly programmed NextGen to automatically bill certain services incident to a physician's treatment, regardless of the physician's involvement in that treatment.

*Examples of this billing scheme.*

70.     ACLD used the services of an SLP provider named Linda Howe, who was contracted to provide SLP services to ACLD's clients.  On November 12, 2008, Ms. Howe saw a patient named CC.[5]  CC had a diagnosis of "Developmental Language Disorder" and received one unit of treatment at a rate of $218.  This is a physician reimbursement rate, which is higher than an SLP's reimbursement rate.

71.     A printout from Medical Manager shows that the service was attributed to Dr. Schenendorf.

72.     Despite this appointment being billed at Dr. Schenendorf's $218 rate, he had not seen CC in at least a year, if ever.

73.     Moreover, Linda Howe provided SLP services at ACLD for several years while never being credentialed as a Medicare provider, meaning ACLD could not be reimbursed for her services.  To remedy this problem, her services were billed incident to Dr. Schenendorf and/or Dr. Jack Nass's treatment.  Dr. Nass, like Dr. Schenendorf, was a psychiatrist at ACLD.

74.     However, upon information and belief, neither Dr. Schenendorf nor Dr. Nass had any history with her patients or any involvement in their treatment.

75.     ACLD's CFO, Sandi Gutmanstein, openly admitted that Ms. Howe was not credentialed. In an email she wrote to Ms. Lilla and Annie Winterfeldt sent on September 2,

---

[5] The patient's actual name is omitted to protect his or her privacy.

16

2014, Ms. Gutmanstein stated, "Since Howe was never credentialed, can you select another provider to check who was besides Domingo?"

76.     On December 29, 2014, Annie Winterfeldt mentioned in an email to Beth Lilla and Ms. Gutmanstein that Ms. Howe was not credentialed with Medicare, meaning ACLD could not receive reimbursements from the government for her services: "While I was supervisor, it was the procedure to hold the claims until the provider was credentialed. Howe was an exception to this because she could not be credentialed."

77.     Moreover, in the same email Ms. Winterfeldt stated that prior to July 1, 2009— the date that an SLP could be credentialed under the new Medicare rules—"claims were submitted under a supervising provider because Medicare stated that a SLP was not able to enroll." This amounts to an admission of incident to billing fraud.

78.     The scope of just the SLP fraud is significant. By the time Ms. Scarlato was fired, ACLD employed eight SLP providers, who would see patients all day. This amounts to dozens of SLP appointments per week. Given the extent of the practice, the false claims just for SLPs could run into the thousands.

79.     The practice extended beyond SLPs. Susan Nifenacker was a nurse practitioner ("NP") at ACLD during the period in question.

80.     Ms. Lilla discovered through reviewing the bills submitted to Medicare and Medicaid for her services that NextGen was pre-fabricated to bill Ms. Nifenacker's services incident to Dr. Richard J. Kessler (ACLD's Chief Medical Officer) or Dr. Schenendorf's treatment. However, when reviewing the appointment histories of Ms. Nifenacker's patients, Ms. Lilla discovered that many of them had no relationship with those doctors nor had they ever received any treatment by them.

81.     This is in direct contravention of 42 C.F.R. § 410.26(b)(2), which requires incident to services to be an integral (though incidental) part of the service of a physician in the course of diagnosis or treatment of an injury or illness.

82.     Ms. Lilla looked at all of the bills for Ms. Nifenacker's services within a six month period (within the relevant time period alleged) and identified rampant fraudulent incident to billing.

83.     Similarly, upon information and belief, a social worker named Sarah Silverstein who started working at ACLD in 2012 did not have the proper credentials to bill Medicare and Medicaid.  Ms. Lilla discovered that in order to receive reimbursements for her social work services, ACLD simply billed her services out incident to Dr. Schenendorf's treatment when her clients had no relationship and had received no treatment from Dr. Schenendorf (in fact, it was Marian Kaskel who supervised Silverstein and signed off on her superbills and notes).

84.     In the December 29, 2014 email, Annie Winterfeldt stated to Beth Lilla and Sandi Gutmanstein that "Social workers without R certification were billed with supervising provider."

85.     The practice of automatically billing non-physician services incident to physician services where those physicians had no history or treatment of the patient was rampant at ACLD.

*(ii) Fraudulent Incident To Billing: Physician Not Present in the Office When Services Rendered*

86.     From at least 2008 to at least July of 2015, ACLD's practice of indiscriminately billing non-physician practitioner services as incident to a physician's treatment resulted in numerous cases where the "supervising physician" was not even in the office while the alleged incident to service was being provided by a non-physician.

87.     For example, Dr. Gerald Ente, a pediatrician who is in his 80s, was often designated for billing purposes as a supervising provider to non-physician services when he was

not even on site or in the state. In fact, he was often at his residence in Florida while these services were being provided. This was in clear violation of the incident to rules.

88. Given ACLD's billing practice of setting up a template in NextGen to automatically bill certain services incident to a physician's treatment without scrutinizing the role of that physician (if any) in the patient's care, there are undoubtedly numerous additional examples of ACLD flouting Medicare's "direct supervision" rules.

*(iii) Fraudulent Billing/False Certification: Services Rendered Without Treatment Plan*

89. As stated in paragraph 32, in order to bill Medicare for certain services (including as incident to a physician's treatment), the provider must prepare a treatment plan certified by a physician. Current treatment plans are necessary for the government to confirm that a supervising provider has deemed the services to be necessary.

90. This is required for Medicare reimbursements for PT and SLP services.

91. Upon information and belief, ACLD was routinely billing Medicare and Medicaid in violation of this requirement for patients requiring and receiving PT and SLP services.

92. While some patients did have treatment plans in place, they were not reviewed by doctors or non-physician practitioners as required by law.

93. Additionally, many of the treatment plans were unsigned. They were also not updated every 90 days as required by law.

94. Ms. Scarlato conducted an audit in 2015 regarding whether or not patients were properly referred to non-physician services like PT, OT, SLP or social work. One of her responsibilities as part of this audit was to check to make sure the treatment plans were updated and current for each patient.

95.    Ms. Scarlato noticed that for nearly all of the patients whose files she audited, there was no treatment plan in the file at all.  When she asked a colleague where these treatment plans were, she was informed that some doctors would not sign these treatment plans because they had nothing to do with these patients' treatment.  The colleague told her that these treatment plans had been shredded.

96.    Ms. Scarlato later found out that numerous patients were being seen without having treatment plans, which violates federal regulations.

97.    In June 2015, Ms. Scarlato emailed Ms. Lilla with a sampling of patients who were receiving services (being billed to the government for reimbursement) without an active treatment plan.  The email mentions six patients and over 100 appointments which were billed without treatment plans.

98.    ACLD knew all along that they were violating the Medicare reimbursement rules by not properly instituting treatment plans—in fact, some doctors refused to sign the treatment plans because they had no involvement with the patients.  Still, ACLD continued to receive reimbursements for these services in brazen violation of federal law.

## DEFENDANT'S KNOWLEDGE OF THE FRAUD

99.    In 2008, Medicare denied one of ACLD's incident to claims for SLP services where a Dr. Blatt—a podiatrist—was billed as the supervising provider.

100.    Podiatry and speech-language pathology are completely separate disciplines, and a podiatrist could not possible qualify as a supervising provider for SLP services.

101.    On November 7, 2008, Annie Winterfeldt, then a billing supervisor, emailed the director of coding, Patricia Sary, stating: "We have rcvd denials from Medicare stating that Dr Blatt is not eligible to be a supervising provider for speech.  Can you please check the policy and

see if there was an exclusion for podiatrists (DPM)? Thanks." The Director of ACLD's Health Services, Mark Crean, was copied on the email. Ms. Lilla was not aware of any response.

102.    After Ms. Winterfeldt sent a follow-up email on November 13, 2008, Patricia Sary replied on November 14, 2008, stating: "I've researched the Medicare guidelines for 'incident to' in regard to the speech therapy denials received, and have determined that Medicare was justified in doing so. Medicare defines the 'incident to' services as those furnished as an integral... part of the physician's professional services in the course of diagnosis or treatment of an injury or illness. There must be a direct connection between the supervising physician and the service being provided. It is not likely that a podiatrist would supervise speech therapy. Going forward we will not be billing under the following providers: the podiatrists, the gyn clinicians, or the dermatologist."

103.    This email exchange confirms that ACLD understood the incident to rules and understood what was required in order to properly bill a service as incident to.

104.    After this email was sent, ACLD never went back to reimburse the Government for its other incident to claims where the supervising provider had no relationship to the service being provided. The fraud, to a large extent, simply continued.

105.    Moreover, upon information and belief, when ACLD switched from the Medical Manager computer billing system to NextGen in 2013, templates were set up at the direction of Mr. Crean and Ms. Gutmanstein to automatically bill certain non-physicians' services incident to doctors' treatment, without any regard to Medicare's incident to guidelines.

106.    In May 2014, shortly after beginning her work in ACLD's billing department, Ms. Lilla reported her discovery of widespread billing fraud perpetrated by ACLD to Ms.

21

Gutmanstein, who then told Jodi Freed-Froehlich, ACLD's Director of Corporate Compliance and Quality Management, to look into the situation.

107.   In July 2014, Ms. Lilla emailed Ms. Gutmanstein, identifying a situation where an SLP, Karen Polizzano, saw a patient for speech and it was billed under Dr. Schenendorf and Medicare paid the bill.  Ms. Gutmanstein responded: "Yes, this is very concerning[.]"  Still, ACLD took no action to return the fraudulently obtained reimbursements to the Government.

108.   A meeting was held in early September of 2014 to discuss the SLP billing problems.  This was the same meeting where Mark Crean admitted that he and others had programmed the billing systems to automatically bill certain non-physician practitioners incident to the services of a physician.

109.   Ms. Freed-Froehlich summarized the meeting in a September 5, 2014 email to Sandi Gutmanstein, Beth Lilla, Mark Crean and others.  In that email, Ms. Freed-Froehlich stated:

a) that she and others were looking into whether ACLD has billed "incident to" appropriately in all areas, not just SLP;

b) that she and others are concerned that the problems goes back as far as 2008;

c) that Ms. Gutmanstein will reach out to representatives of Medical Manager to determine how much it would cost to generate a custom report on the incident to billing issue;

d) that the report should contain certain data pertinent to the extent and scope of the incident to billing issues.

110.   In an email response the following day, Ms. Lilla added that Dr. Ente was often times listed as the supervising provider when he was not on site or even in the state.

111.    Following this meeting, Ms. Gutmanstein determined that Medical Manager would not customize reports to determine the extent of the incident to billing problems, and that ACLD would have to purchase Medical Manager's "expensive report writer or find a consultant" to prepare the report.

112.    On October 25, 2014, Ms. Gutmanstein wrote in an email that the Medical Manager report writer would cost upwards of $25,000.  Both Mark Crean and Robert Goldsmith, the Executive Director of ACLD, were copied on the email.

113.    In the fall of 2014, Sandi Gutmanstein told Ms. Lilla that she thought if ACLD paid back the Government all it was owed, the agency would not have the funds to continue operating.

114.    In the fall of 2014, Robert Goldsmith made the determination not to spend the money on an audit of Medical Manager to determine the extent of the fraud.

115.    Unhappy and uncomfortable with ACLD's billing practices, Ms. Lilla resigned on her own volition on June 30, 2015.

116.    To date, ACLD has not paid back the money it fraudulently obtained from the Government.

## FIRST CAUSE OF ACTION
### Federal False Claims Act Violations 31 U.S.C. §§ 3729(a)(1), (2) and (7) (FCA pre-May 20, 2009 amendment)

117.    Relators reallege the above allegations as if set forth fully herein.

118.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, prior to its May 20, 2009 amendment.

119.    Through the acts described above and otherwise, since at least November 2008, the Defendant, by and through its agents and employees: (i) knowingly presented, or caused to

be presented, to an officer or employee of the United States Government a false or fraudulent

claim for payment or approval; (ii) knowingly made, used, or caused to be made or used, a false

record or statement to get a false or fraudulent claim paid or approved by the Government; and

(iii) knowingly made, used, or caused to be made or used a false record or statement to conceal,

avoid, or decrease an obligation to pay or transmit money or property to the Government, all in

violation of 31 U.S.C. §§ 3729(a)(1), (2) and (7) (prior to May 20, 2009 amendment).

120.    On information and belief, the United States was unaware of the falsity of the

records, statements, and claims made or submitted by the Defendant.

121.    On information and belief, the false and fraudulent representations and claims

made to the United States by the Defendant were material to the Government's decisions to

make Medicare and Medicaid payments to the Defendant; and were specifically material to the

amount of money the Government decided to pay the Defendant as Medicare and Medicaid

reimbursements.

122.    On information and belief, if the United States had known of the false or

fraudulent nature of the Defendant's representations and claims, it would not have made the

Medicare and Medicaid payments to the Defendant, and would not have made such payments in

the amounts they were paid.

123.    By reason of the Defendant's violations of the False Claims Act, the United States

has suffered economic loss.

WHEREFORE, Relators Beth Lilla and Linda Scarlato, acting on behalf of the United

States of America, demand that Defendant ACLD, pay the United States of America the penalty

of not less than $5,000 and not more than $10,000 per violation, three times the amount of

damages which the United States of America has sustained because of the violation of the False

Claims Act, plus litigation costs and reasonable attorney's fees, and other such relief as the Court deems appropriate.

## SECOND CAUSE OF ACTION
### Federal False Claims Act Violations 31 U.S.C. §§ 3729(a)(1)(A), (B) and (G) (as amended on May 20, 2009)

124.   Relators reallege the above allegations as if set forth fully herein.

125.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended on May 20, 2009.

126.   Through the acts described above and otherwise, the Defendant, by and through their agents and employees: (i) knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval; (ii) knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; and (iii) knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, all in violation of 31 U.S.C. §§ 3729(a)(1)(A), (B) and (G) (as amended on May 20, 2009).

127.   On information and belief, the United States was unaware of the falsity of the records, statements, and claims made or submitted by the Defendant.

128.   On information and belief, the false and fraudulent representations and claims made to the United States by the Defendant were material to the Government's decisions to make Medicare and Medicaid payments to the Defendant; and were specifically material to the amount of money the Government decided to pay the Defendant as Medicare and Medicaid reimbursements.

129.    On information and belief, if the United States had known of the false or fraudulent nature of the Defendant's representations and claims, it would not have made the Medicare and Medicaid payments to the Defendant, and would not have made such payments in the amounts they were paid.

130.    By reason of the Defendant's violations of the False Claims Act, the United States has suffered economic loss.

WHEREFORE, Relators Beth Lilla and Linda Scarlato, acting on behalf of the United States of America, demand that Defendant ACLD, pay the United States of America the penalty of not less than $5,500 and not more than $11,000 per violation, three times the amount of damages which the United States of America has sustained because of the violation of the False Claims Act, plus litigation costs and reasonable attorney's fees, and other such relief as the Court deems appropriate.

### THIRD CAUSE OF ACTION
**Violation of N.Y. State Finance Law §190(a)(b)(g) and (h)
(effective April 1, 2007)**

131.    Relators Beth Lilla and Linda Scarlato reallege the above allegations as if set forth fully herein.

132.    Both Ms. Lilla and Ms. Scarlato are original sources of the information giving rise to the herein causes of action pursuant to State Finance Law § 188(5).

133.    The New York State Department of Health ("State of New York") is the state agency administering New York's Medicaid program.

134.    On information and belief, the State of New York, along with local governments, pays 50% of the costs of the claims made by providers for services rendered to individuals eligible for Medicaid.

135.    The State of New York requires of Medicaid providers, among other things, that they submit claims for payment only for services actually furnished, which were medically necessary, provided by the provider under his supervision, furnished by an individual with a valid license, registration and/or certification. 18 NYCRR §§ 504.1; 504.3; 504.6.

136.    In connection with claims submitted to the New York Medicaid Program and the United States, since approximately at least 2008, Defendant: (i) knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval; (ii) knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim; (iii) knowingly made, used or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government; and (iv) knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the state or a local government, or conspired to do the same, all in violation of N.Y. State Fin. Law §§189(1)(a), (b), (g) and (h).

137.    On information and belief, the State of New York has paid money to the Defendant upon the false and fraudulent claims described in this complaint and has suffered damages.

138.    On information and belief, if the State of New York had known of the falsity of the Defendant's claims, it would not have made the Medicaid payments to the Defendants.

139.    By reason of the Defendants' violations of the False Claims Act, the State of New York has suffered economic loss.

WHEREFORE, Relators Beth Lilla and Linda Scarlato, acting on behalf of the State of New York, demand that Defendants pay the United States of America the penalty of not less than $6,000 and not more than $12,000 per violation, three times the amount of damages which the

State of New York sustained because of the violation of the New York False Claims Act, plus

litigation costs and reasonable attorneys' fees, and other such relief as the court deems

appropriate.

## DEMAND FOR JURY TRIAL

The Relators hereby demand trial by jury.


DATED:      New York, New York
            March 2, 2016




            Respectfully submitted,

            BERANBAUM MENKEN LLP



            By: Bruce E. Menken
            Scott Simpson
            80 Pine Street, 33rd Floor
            New York, New York 10005
            (212) 509-1616
            (212) 509-8088
            bmenken@nyemployeelaw.com